## NOVOCOL CHEMICAL MFG. CO., Inc., v. POWERS & ANDERSON DENTAL CO., Inc.

### No. 28.

District Court, W. D. North Carolina.

March 10, 1941.

Paul B. Eaton, of Charlotte, N. C. (S. Mortimer Ward, Jr., and James B. L. Orme, both of New York City, of counsel), for plaintiff.

Clayton Lee Burwell, of Charlotte, N. C. (Chritton, Wiles, Davies, Hirschl & Dawson and Charles J. Merriam, all of Chicago, Ill., of counsel), for defendant.

WEBB, District Judge.

The complainant seeks an injunction against the respondent, asking that the respondent be restrained from packaging the well known cartridge in a vacuumized bakelite cup. The respondent alleges that it has a right to use the bakelite vacuumized cup for shipping cartridges, and alleges that the Goldberg patent is void. As the respondent alleges, the Goldberg patent produces "nothing unknown and produces no new result by putting the old dental cartridges invented by Cook into an old tin can".

For many years before the Goldberg patent, it was generally known that air would discolor and finally destroy adrenalin, called in this suit epinephrin.

As an example of this public knowledge, the Journal of the American Pharmaceutical Association in 1914 published an article by C. P. Beckwith entitled "The Pharmacy of Adrenalin". In this article the author, among other things, says: "Under the combined action of air and moisture, adrenalin is decomposed rapidly. It is well, therefore, to store the product away from strong light and heat in absolutely dry, closed bottles or tubes sealed airtight. So protected and hermetically sealed, it is probable that adrenalin would prove absolutely permanent. The oxygen of the air is destructive of adrenalin. Given good storage, the precaution most essential to the preservation of the commercial solution of adrenalin chloride is to minimize contact with air. The oxidation that occurs upon undue exposure is evidenced by change of color. The solution becomes pink, then red, then brown, and a brown precipitate settles out."

Again, Dr. L. S. Fosdick, Professor of Chemistry at Northwestern University, as a witness before the Court, stated, in answer to this question: "Did you understand at that time (1933) that air caused the discoloration of the liquid (adrenalin)?" "It was generally known, yes."

He further said that the epinephrin (adrenalin) became discolored on the first day, if permitted to stand in air, and in a vacuum it remained from January to June 5 without any discoloration.

The Court asked Dr. Fosdick: "How long have you known that air would discolor this anesthetic (adrenalin)?" And the Doctor answered: "I don't know exactly, but I have studied chemistry for at least—that is, I knew it at least when I was an undergraduate in college—15 years at least."

Dr. Fosdick further swore that he was called in by the Minimax Company as a consultant in 1935, probably in August or September. "I developed the solution for them, and suggested that they put them up in vacuum package, due to the fact that air would cause oxidation of the bisulphite; or they could substitute the vacuum by any other inert gas or material."

Again, he was asked: "You say you suggested in 1935 that they put this in vacuum?" To which the Doctor replied: "Or in an oxygen-free container. You can fill the can with an inert material, for instance. I told them they would have to exclude air from the package in order to preserve the alkalinity. I suggested that they could package them in vacuum or inert gas."

By the Court: "Did you know this solution would turn yellow?" Ans. "I had been teaching it to my students for years. The plaintiff's solution has the same constituents, but not perhaps the same proportions. I think they are identical."

The Court: "You mean by that, if there were no bisulphite in this solution, the oxidation would take place much more quickly?" Ans. "In about 10 seconds. When you put this mixture (that is, this anesthetic solution) in a vacuum, you stop the oxidation of the bisulphite because the bisulphite is the first thing to oxidize in any of these solutions."

The Doctor further stated that it was impossible to put enough bisulphite in the solution to prevent discoloration of the adrenalin.

"Q. As I understand you, the vacuum package now prevents the oxidation of the bisulphite, but the bisulphite protects the adrenalin? A. That is right."

The Doctor further stated that he taught organic chemistry to dental students, that he gave them a fairly comprehensive review of the subject of anesthetics in general, and that he told them to make up their own solution, because the cartridge would oxidize, because the air leaks into the cartridge and causes an oxidation of the sulphite and adrenalin.

"I was teaching that in 1927, and the man there (at Northwestern University) before me was teaching it too."

Samuel D. Goldberg, the original patentee, stated that he knew all along when he was making his experiments that air would cause the solution to discolor; that he made his experiments to determine if air was getting into the solution.

"Q What were you doing these experiments for? Dr. Goldberg: It was not known conclusively at that time what was causing the discoloration."

Dr. Goldberg stated further: "The next thing after I satisfied myself that the exclusion of the air from the bottle had prevented discoloration, I went to the American Can Company."

"The Court: You knew all along that the air would discolor the solution? A.

596

Yes, but I did not know that air was getting into the cartridge until these experiments convinced me. That was about October, 1934, and I got the cans from the Continental Can Company about April, 1935, but the vacuum-sealed tin cans were put on the market about October 1, 1935, and the patent was granted August 18, 1936, although I made application for it on May 10, 1935."

Dr. Nevin, the president of the complainant company, stated in substance that he had always known that air would discolor adrenalin, that it first produces a pink coloration, then brown, then a chocolate color.

Another witness for the complainant, Dr. Harold E. Story, of Charlotte, an exodontist and oral surgeon, stated when asked the following:

"Q. How long have you understood that the cause of the discoloration is by oxygenation? A. Since 1923 or 1924. Before that time dentists usually made up their own solution and used tablets."

Dr. Wilkie testified:

"Q. What caused the discoloration of these cartridges? A. I believe it is the epinephrin; an oxidation process takes place there.

"Q. How long have you known that? A. Almost since I have been using it, or shortly after I graduated from college, in 1923 or 1924."

Thus it will be seen that it was long known that air, in contact with the well known solution in the cartridge, would discolor and finally make useless the solution.

### The Cartridge.

The cartridge mentioned all through the testimony in this suit is a small glass tube about the size of a lead pencil, about 3 inches long, filled with the solution known as adrenalin and procaine, the tube being closed at each end with a rubber plunger or stopper. The rubber plunger or stopper serves two purposes—(1) to keep the solution in the tube, and (2) to keep the air out of the solution. The rubber plunger must not fit so tightly as to prevent its being moved inside the tube. . The glass tube so described is called by the trade a cartridge. These cartridges are made by probably a hundred different manufacturers of dental anesthetics in the United States. When the cartridges are delivered to the dentist, he opens the package or carton in which they are shipped to him, removes them one at a time as needed, and places the cartridge in a hypodermic syringe, which has a little rod on the end, by which the rubber plunger is pushed towards the opposite end of the cartridge into and through a needle, the pressure from the rubber plunger forcing the solution through the needle and into the gum of the patient. There is no patent on these cartridges. The adrenalin in them is used to prevent bleeding and the procaine to prevent pain.

### The Can.

The tin can, mentioned in the testimony in this suit, is a cylindrical airtight tin can about 3½ inches long and about 2½ inches in diameter. The "key" is attached to the top end of the can for the purpose of unwinding a strip of tin running entirely around the top end of the can, for the purpose of opening the can. The can is purchased from the Continental Can Company and seems to bear several of their patent numbers, one being 1615930. I therefore presume that the Continental Can Company has a patent on this airtight can.

The complainant places the cartridges of its manufacture in the cans, and ships them to the trade airtight or vacuumized. It is presumed that the Continental Can Company will sell these cans to any one who wishes to buy them. Airtight cans or receptacles of various sizes are used by many manufacturers in shipping various products hermetically sealed.

In simple language, the Goldberg patent consists of an anesthetic cartridge or cartridges (as described above) in a tin can (as described above). The inventor states in his letters patent that: "Fig. 1 is a view of my device (meaning the can) in elevation, with a portion of the container (the can) broken away to show the receptacle or cartridges positioned therein." The letters patent are entitled "Device for Preserving Local Anesthetic Solutions".

Now the question to be decided is whether the cartridge and the can in combination or aggregation are patentable. Is this combination or aggregation such a novelty or so original that it can be patented?

It is true that Dr. Goldberg by several experiments ascertained, or convinced himself, that air was leaking by the rubber stopper into the solution. Now I think that if the Doctor had discovered or manufactured, in view of his knowledge that air was leaking into the cartridge, a substance that could have been used as a stopper or rubber fitting in an airtight manner and

still be movable, that would have prevented the leakage of air, then he could have patented such a material for a stopper; for that would have been novel and original. But, having satisfied himself that air was leaking by the rubber stopper, then the way to prevent the air reaching the solution was obvious, that is to place the cartridge in an airtight receptacle. It required no skill or originality or novelty to do this. I cannot see that there is a novel or original idea in placing these cartridges in an airtight can.

In the case of Watson v. Cincinnati, etc., Railway Company, 132 U.S. 161, 167, 10 S. Ct. 45, 47, 33 L.Ed. 295, the Court said: "If however, such an inference is permissible, and the patent must or may be construed to consist in such a combination of inside and outside doors as is asserted, it cannot be upheld, because it does not involve invention, but consists in a mere aggregation of parts, each to perform its separate and independent function, substantially in the same manner as before combination with the other, and without contributing to a new and combined result."

■ "The results must be a product of the combination, and not a mere aggregate of several results each the complete product of one of the combined elements. * * * Merely bringing old devices into juxtaposition, and there allowing each to work out its own effect without the production of something novel, is not invention." Hailes v. Van Wormer, 20 Wall. 353, 87 U. S. 353, 368, 22 L.Ed. 241.

■ "That a combination of the old elements in a structure may constitute invention, there must be a mental conception, a new and improved result that the ordinary mechanic skilled in the particular art could not have produced without the exercise of inventive skill." Rapp v. Central Fire-Proof Door & Sash Co., C.C., 158 F. 440.

■ "Mere aggregation, when the result is but a combination of the known functions of the various parts, is not invention." In re Merritt, 36 App.D.C. 122.

"The method of cutting up meat, preparing it with antiseptics, pressing, putting into cans, pressing afterwards, and then hermetically sealing the cans, is not patentable, for want of novelty." Wilson Packing Co. v. Clapp, C.C., Fed.Cas.No.17,851.

■ The patent must be the product of the exercise of the inventive faculties and involve something beyond what is obvious to persons skilled in the art to which it relates. Pearce v. Mulford, 102 U.S. 112, 26 L.Ed. 93.

■ A "combination" to be "patentable" must produce a different force or effect or result in combined forces or processes from that given by their separate parts, and there must be a new result produced by their union, otherwise it is only an "aggregation" of separate elements. In re Herthel, Cust. & Pat.App., 104 F.2d 824.

■ I think it is universally held that where a patent merely covers an aggregation of old devices without securing any new or useful result by their joint action, the patent is void. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008.

What new result did the placing of a cartridge in an airtight can produce? It is axiomatic that an airtight can excludes the air. An airtight can has always excluded air long before the cartridge was placed in it; so there certainly was no new result. The cartridge, when placed in the can, produced no new result. It would still leak air by the stopper and was the same identical device whether in the can or outside the can.

The method of excluding air by the use of an airtight can is old. A hermetically sealed metal box or bottle or fruit jar or oyster can will produce the same result, that is exclude air. I therefore feel that the aggregation of the can and the cartridge was nothing more than the bringing together of two old parts that did not produce any new or different function or operation than that theretofore performed or produced by them. The combination did not produce a new function. The airtight can only produced the function or result that it always produced, that is, kept out air. I cannot see that the inventor has invented anything. The cartridge is not his device; neither is the can; and simply placing the cartridge in the airtight can produced a result which is old and with which everybody is familiar, that is the exclusion of air.

Suppose the patentee had placed the solution in bulk in an airtight tin can and had patented same, could it be argued that he would have had a monopoly of all the airtight containers for the purpose of shipping or storing the anesthetic? Of course not; because everybody knows that air discolors the solution and that an airtight can

would prevent air getting to the solution. Placing the solution in bulk in the airtight can would have produced, therefore, no new result. Now, placing 25 cartridges, filled with the solution, in each of the cans in question is very little more than placing the solution in bulk in the can for the purpose of doing that which is obvious, and that which the public knows, that is, keeping air from the solution.

Counsel for the complainant contended before the Court that it would be an infringement of its patent for a manufacturer to place cartridges in any sort of airtight container, even tin cans, bottles, metal boxes, fruit jars or steel drums. I cannot think that the complainant has a right, by reason of his patent, to deprive any manufacturer of the privilege of excluding air from cartridges, to prevent discoloration, by any method it chooses, since it has been known for years that air does discolor the solution.

I regard the Goldberg patent as a mere aggregation of the cartridges and the can, and feel, therefore, that it is not patentable, and am constrained to hold the patent void.